# 16-628(L)

16-639(CON), 16-640(CON), 16-641(CON), 16-642(CON), 16-643(CON), 16-644(CON),
16-649(CON), 16-650(CON), 16-651(CON), 16-653(CON), 16-657(CON), 16-658(CON),
16-659(CON), 16-660(CON), 16-661(CON), 16-662(CON), 16-664(CON), 16-665(CON),
16-666(CON), 16-667(CON), 16-668(CON), 16-669(CON), 16-670(CON), 16-671(CON),
16-672(CON), 16-673(CON), 16-674(CON), 16-675(CON), 16-677(CON), 16-678(CON),
16-681(CON), 16-682(CON), 16-683(CON), 16-684(CON), 16-685(CON), 16-686(CON),
16-687(CON), 16-688(CON), 16-689(CON), 16-690(CON), 16-691(CON), 16-694(CON),
16-695(CON), 16-696(CON), 16-697(CON), 16-698(CON)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

AURELIUS CAPITAL MASTER, LTD., ACP MASTER, LTD.,

*Plaintiffs-Appellants*,

v.

THE REPUBLIC OF ARGENTINA,

*Defendant-Appellee,*

(*Caption continued on subsequent pages*)

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR PLAINTIFFS-APPELLANTS AURELIUS CAPITAL MASTER, LTD., ACP MASTER, LTD., AURELIUS CAPITAL PARTNERS, LP, AURELIUS OPPORTUNITIES FUND II, LLC, AND BLUE ANGEL CAPITAL I LLC

(*Appearances listed on subsequent pages*)

March 14, 2016

BLUE ANGEL CAPITAL I LLC, BANCA ARNER S.A., BRANTFORD, HOLDING S.A., AURELIUS OPPORTUNITIES FUND II, LLC, FFI FUND, LTD., FYI LTD., NML CAPITAL, LTD., OLIFANT FUND, LIMITED, RICARDO PONS, OFELIA NELIDA GARCIA, NW GLOBAL STRATEGY, VIRGILIO LUIS FOGLIA, MARIA CRISTINA ARGENT BARNA, RICARDO AURELIO TRIAY, ADELA NOEMI JURI, TORTUS CAPITAL MASTER FUND, LP, HECTOR PEREZ, MARLAND INTERNATIONAL S.A., LIS CARINA MEDINA, M. ALEJANDRA TERRA RISSO, WITKRON S.A., GOLSUN S.A., JUAN ALBERTO JOSE, JOSE LUIS QUATRINI, MARIO ALBERTO RUIZ, FARIGOLD TRADE S.A., CLAUDIO MARTINEZ, FRANCISCO DE GAMBOA, SILVIA ALCIRA MURILLO DE GEBERT, ENRIQUE ANTONIO JULIO GEBERT, LAYNEL CORPORATION, LIVIO MAZZOLA, BRADFORD PROMOTIONS S.A., HAMBURG CONSULTING INC., PIERINO GARRAFA, CARLOS JESUS SENDIN, EDUARDO GIBSON, FRANCISCO BASSO, FRANCA ANTONIONE, FLORENCIO PEREZ, JUAN CARLOS GRECO, RAMON ZUBIELQUI, EDUARDO ANDRES FRANCHESCHI, GELLXON CORP., ENRIQUE COHEN, MARIA ISABEL BERRAONDO, GRACIELA ZUBASTI, ADOLFO SANCHEZ BLANCO, RAFAEL ANTONIO SALAMANCA, KINBURG TRUST S.A., MAZZINI, JORGE MARCELO, GRACIELA ALEJANDRA, COMPANIA CALITECNO S.A., ZUM FELDE, HEINRICH PETER BARAVALLE, ANA VALERIA, ALEJANDRO PABLO BARAVALLE, EZEQUIEL HERNAN BACLINI, PATRICIA RUTH CARONNA, JOSE ALBERTO LANDI, SALVADOR SADDEMI, MARIA TERESA LEPONE, HERNAN TABOADA, SUSANA FRASCA DE LAURIA, NORBERTO PABLO GIUDICE, SUSANA LAURIA, GUILLERMO DOTTO, JORGE MANUEL TABOADA, MARIA DEL CARMEN ESCUDERO, ROSAS DE COHEN, ESTRELLA BETY, CORBINS TRADE S.A., LUIGI GIACOMAZZI, LUCIANA PEDROLLI, PATRIZIA GIACOMAZZI, MICHELE STAGNITTO, CLAUDIO MIGUEL MATHEOU, HUGO MASINI, VIVIANA NOEMI TUORON, GUILLERMO JORGE DOMATO, IMPERIAL BYLIDOL S.A., DARIO ALBERTO PARDAL, PAULA MASTRONARDI, HORACIO ALBERTO VAZQUEZ, LILIANA CEBROWSKI, DIEGO PEDRO PELUFFO, JUAN OMAR GIOVACHINI, LILIA ANGELICA PARISI, TRALOVE COMPANY S.A., MAURA MALETTI, GRACIELA ADRIANA GAMITO, ADRIAN CALEFFA, GUILLERMO ALMANZA, FELICITAS C. VON GROMANN, ROBERTO VIRGILIO SAURO, RITA LESO, RODOLFO ALBERTO GIL, VICENCIO, VIVIAN ORIANA VICENCIO SAAVEDRA, FELICITAS FLORENCIA FOX ANASAGASTI, FRANCISCO EDUARDO DE LA MERCED, ISABEL EVANGELINA BAVASSI, MAKAPYAN S.R.L., FRANCISCO JOSE MECHURA, GRACIELA DONNANTUONI, BERNARDO G. FERMAN, FRANCAISE COMPAGNIE, D'INVESTISSEMENTS S.A., MARIA SUSANA PAGANO, CARLOS ALBERTO LAGOS, JULIO HECTOR KRASUK, MAZORAL S.A., MIGUEL LIMOLI, LUCIO RAMON MUR, JESUS JORGE OTANI, ALEJANDRO ENRIQUE FERNANDEZ, GUIDO DEBIASI, ATTILIO DE ROSA, MANUEL G. GUILLEN, BEATRIZ M. CASTANO, MONICA HAYDEE GRACIOTTI, LISANDRO ROBERTO ARTURO MORA, ABEL VICENTE SANTANA, MARIA CLAUDIA MANGIALAVORI, HORACIO ALBERTO M. SANC CABALLERO, RICARDO SANCHEZ CABALLERO, ELISA SANCHEZ CABALLERO, FIRST CITY S.A., JORGE JORACIO ROSINI, ALICIA ESTER SALVADOR, DOLLY ESTHER

CUBASSO, SANTA SORRENTINO, RODOLFO BURUL, LYDIA HAYDEE GIGAGLIA, ANSGAR NEUENHOFER, DORA RAQUEL MALEC, CLAUDIO OSCAR MAZZA, ADRIANA BEATRIZ POVEDA, ALBERTO SILVIO BURSZTYN, ANDREA FABIANA FUCITO, CARLOS ALBERTO LAGOS, MARIA DEL LAS MERCEDE LAGOS, MAURIZIO GIOVE, GUILLERMO CARLOS F. CENTENO, CARLOS ALBERTO MURACA, PATRIZIA VALERI, ANDREA RONZON, SILVA FALOMO, VITTORIO GIANNATTASIO, MONICA GIANNATTASIO, MARCELO EDUARDO PRIMA, RICARDO SANCHEZ CABALLERO, ELISA SANCHEZ CABALLERO, SUSANA MOLINA GOWLAND, THEA PINA GORGONE, ALESSANDRA PADOAN, GLORIA PADOAN, PIERLUIGI PADOAN, THEA PINA GORGONE, LUIGI PADOAN, MASSIMILIANO MAZZANTI, MANUELA MAZZANTI, GIUSEPPINA FUSCHINI, MARTA GUERRINI, CORRADO GUERRINI, STEFANIA SIMONCINI, LUIGI PACIELLO, LERINERCO S.A., AURELIO PESENTI, ARNOLDO DOLECETTI, TELLADE NAVA, TOMMASINO VITIELLO, LUIGI VITIELLO, GABRIELLE DOLCETTI, GUISEPPE DOLCETTI, PABLO HUGO KALBERMANN, EVA SONDERMANN GELLER, PEDRO KALBERMANN, INTER PALMISANO S.A., DORA RAQUEL MALEC, ANDREA SUSANA BURSZTYN, ALBERTO SILVIO BURSZTYN, ALFREDO PACHECO, FRANCES BROWN, ADOLFO MIGUEL MUSCHIETTI, JOSE ANTONIO MUSCHIETTI, MARIA CRISTINA BUENANO, ADOLFO MIGUEL MUSCHIETTI, MARIA CRISTINA BUENANO, RODRIGO FELIPE MUSCHIETTO, MARIA CRISTINA MUSCHIETTI, ALEJANDRO FEDERICO MUSCHIETTI, NELSON DANTE LUCIANO, DANTE LUCIANO, MERCEDES FELIU, DAVID ADRIAN LUCIANO, OSCAR PAUL CLAVIJO, ANA MARIA AURORA OTERO, CARLOS ALBERTO BRUZZONE, PEDRO KALBERMANN, EVA SONDERMANN, COLOMBO MASI, MARIA ELENA PELAYO, LUIS PEDRO BIVORT, VALENTINA ETCHART, MARIA FAUSTA CILLI, FIORENZO FACCIONI, LEONARDO HILARIO SIMONE, CARLOS ARTURO JOSE ULLA, PATRICIA STORARI, DECIO CARLOS FRANCISC ULLA, OSCAR SECCO, MERCEDES CALVO, DELFIN A. RABINOVICH, DIEGO PEDRO PELUFFO, ELVIRA DAGMAR BUZCAT, LEONIDAS RAUL BORDIGONI, ALEJANDRO FERNANDEZ BARBEITO, RAMON BARBEITO, LIDIA FERNANDEZ DE BARBEITO, MANUEL CALVO, MERCEDES CALVO, ALCIRA NOEMI ARDITI, CLAUDIO GABRIEL ARDITI, FERNANDO BARBEITO FERNANDEZ, SANDRO CONCETTINI, MARIA ASUNCION INMACU CASTELLI, JOSEFA AMBROSELLI, ROBERTO CARLOS PARADA, ROSA SARA POMPEYA LA DE PARADA, GUILLERMO PEDRO PARADA, MARIANO ROBERTO PARADA, ALICIA G. DE SONDERMANN, EVA SONDERMANN, SUSANA SONDERMANN, RICARDO SONDERMANN, PAULA ARMANDA AZCARATE, EDITH ELVIRA NICOLAS, FISEICO, - FINANCIAL SERVICES INTERNATIONAL CORPORATION, ENSENADA UNITED CORPORATION, LORENZO BIANCHI, GIORDANO ALLIEVI, GABRIELLA TOSCANO, AMBROGIO STUCCHI, GIUSEPPE STUCCHI, MARIA LUISA STUCCHI, MORENO LEGNARO, MARIO DAL TOE, DAVIDE CIALLELLA, BRAMANTE DAL TOE, LUCIA VETTORETTI, ALDO NAJ OLEARI, MARIA IDA MODENA, ADA DAL TROZZO, LUIS GARCIA TOBIO, ANTONIA MIRIAN MACIEL, KAZIMIERZ KORNAS, LUIGI GIACOMAZZI, LUCIANA PEDROLLI, AGOSTINO SCOCCHERA, MARCELO SPILLER, ROMINA MARIA

BUSCAGLIA, NORA RAQUEL LOPEZ, GABRIEL MIGUEL, RAMON MIGUEL, MARCOS VANNI, ANA ANTONIA CABRERA, TERENCIANO DE JESUS CABRERA, CARLOS ALBERTO MARTINEZ, MONICA CRISTINA BARBERO, SIDNEY SUTTER, EDUARDO ARGENTIERI, CARLOS ADOLFO ESCATI, ARMANDO EDUARDO VALERIO, MIRTA ANTONIA PORTELA, ROQUE PEREZ VILLALBIA, GABRIEL FEDRICO LEIMGRUBER, FEDERICO HECTOR LEIMGRUBER, LAURA VICTORIA DEMIDOVICH, ALEJANDRO DEMIDOVICH, DIEGO WALTER CASTRILLI, DANIEL HORACIO ROLFO, ALICIA EVELIA GALIANI, SILVIA MABEL SACCONE, MARCELO RUBEN RIGUEIRO, ALFREDO ENRIQUE ZUCCHINI, NESTOR DE NICOLA, GRACIELA MARTA BERRETTI, PAULA DE NICOLA, SANTIAGO ROCCA, ANA MARIA SALDANA, ENRIQUE JORGE ROCCA, JOSEF SCHWALD, DENISE MARIE LAURETTE COLELLA, MICHELLE COLELLA, SUSANA LEONOR GATTI, MARTA BEATRIZ GATTI, LUIS ANGEL GATTI, GRISELDA TERESA DULEVICH, MARIA AGUSTINA SAUCO, MARIA GRISELDA SAUCO, MARIA FLORENCIA SAUCO, OSVALDO LORENZO SAUCO, ANGELA BUSI, RAMON EDUARDO NEBHEN, ANA CECILIA ALBORNOZ, BRUNO ITALIA, RUBEN UBALDO DI MARCO, MARIA LUCRECIA QUIROGA, JORGE ALBERTO ATILIO NEGRI, NICOLAS CARLOS AMADOR FARINOLA, JORGE CORADO FARINOLA, RENATE ARNOLD, IRMA HAYDEE REDONDO DE NEGRI, MASSIMO BALDARI, LILLINA ROSSO, ALBERTO ANICETO GONZALEZ, DELIA ISABEL GONZALEZ, MARIANA GONZALEZ, ROBERTO FEDECOSTANTE, DINA DI TOMMASO, BRIGIDA ELVIRA DENIS, VILMA BURGIO, NAIBY ELIANA SORIA, MARIA MARTA DE LUCA, ALEXANDER STERN, NELIDA AMELIA GIUSTI DE BEHAR, INGEBORG STERN, SERGIO RODOLFO BERRI, STELLA MARIS BOFFELLI, MALCOLM GERALD BERRI, NELIDA ROSA PAOLINI, FRANCO MARIA CONTE, LINA LO VULLO, FRANCESCO MASSOLETTI, DIANA KLEIN, FERISMAR CORP. S.A., CARLOS A. RIAL COTO, MARIA C. UNGARO TORRADO, COUNTY BAY INVESTMENTS LTD., GHIBLI INVESTMENTS LTD., SILVIO EDUARDO SAUCO, MIGUEL KAUFMANN, EDGARDO A. RAMOS, RIVKA SCHMUSKOVITS DE SCHUSTER, NICOLAS SCHUSTER, FLAVIA MARINA SCHUSTER, BEATRIZ LEONOR DE RAMOS, JORG ZAHN, ELENA PASQUALI, PORTICO CAPITAL INC., HARTMUT PETERS, SABINE ZAHN, WOLFGANG BOLLAND, BLIWAY INTERNATIONAL S.A., RICARDO KAUFMANN, MIGUEL ANGEL BITTO, MARIA SILVIA CINQUEMANI, EUGENIO QUARTRINI, OLGA ALBA MARINI, SEBASTIAN QUATRINI, PEDRO MARCELO SEXE, SAMUEL OLDAK, ANNA OLDAK, DAVID OLDAK, URI OLDAK, TELINCOR S.A., SOCRATE PASQUALI, ANNA MARIA CARDUCCI, NORFOLK INVESTMENT TRADE CO. LTD., GAMETOWN CORPORATION, NORBERTO ANGEL GARCIA MADEO, ANA MARIA SAENZ, GRACIELA CANDIDA CORLEIS SAENZ, WEGE ZU MOZART VERANSTALTUNGSGESEKKSCHAFT M.B.H, BOIM S.A., STEFANO SPANICCIATI, NESTOR ALBERTO RUBIN, ANDREAS WILFRED SCHWALD, ANTONIO JUAN PAULETICH, FABIAN E. PAULETICH, FRANCO PERUZ, NORBERTO DARIO CASTELLA, STREET INVESTMENTS LIMITED, GUIDO SCANAVINO, LYDIA SCANAVINO, GIANCARLO GRASSI, HENDRIK BEYER, EDGARDO GERARDO A. SCLAFANI, LUCIA RAFAELA TASSO, ALEXIA BRANDES,

FERNANDO EXPOSITO, MARA CAVANA, MAURIZIO DALLA, RENATO PALLADINI, ANDREA VIGNALI, FINCOMPANY S.A., GLORIA GAGGIOLO, VALERIO CHIRIATTI, SIMONETTA BUCCIOLI, ATTILIO GAUDENZI, LORIS ZAVOLI, ELENA MARCACCINI, ILDEBRANDO MOTTI, TULLIA TURCHI, CARLO CIGOLINI, JUAN EDUARDO COLUMBO, ESTELA ISABEL DELGADO, CARLA NANNI, MAURIZIO PETRONI, ROBERTO AKMAN, LILIANA EDITH GENNI, ARNOLDO DOLCETTI, MARCELLA DOLCETTI, LUCA MULAZZANI, ROBERTO BAUTISTA FRANCO BACCANELLI, ALFREDO CARLOS ALZAGA, MIGUEL ALBERTO BALESTRINI, BIBIANA DELLA FLORA, MARIA ISABEL BALESTRINI, MARIANA NOEMI TAUSS, ALEJANDRO R. LUPPI, ATILIO LUIS POCOSGNICH, ALICIA BEATRIZ GRACIAN, CAROLINA POCOSGNICH, BEATRIZ MARTI RETA, HORACIO TOMAS LIENDO, LUCIANA CEREDI, LUCIANO MILANESI, ALESIA MILANESI, PENG ZEYING, WOON CHEUNG LEUNG, RAUL ALEJANDRO GONZA MARTIN, GUSTAVO CARLOS FERREIRA, JOSE EMILIO CARTANA, RAUL HORACIO MENDEZ, MARIA MERCEDES MENDEZ FERRO, ROBERTO CLAUDIO PITRONA ELLE, ALBERTO GUILLERMO HILLCOAT, ELENA GRACIELA MARTINEZ, ENRIQUE SEBASTIAN PALAC MINETTI, SEBASTIAN JORGE PALACIO, MARIA ESTHER FERRER, AJU S.A., CASIMIRO KORNAS, MICHAEL HEEB, LIDIA FLORINDA PIOLI, ANA LIDIA LEIVAS, JUAN DOMINGO BALESTRELLI, GUNTHER BRAUN, HWB RENTEN PORTFOLIO PLUS, HWB ALEXANDRA STRATEGIES PORTFOLIO, NW GLOBAL STRATEGY, VICTORIA STRATEGIES PORTFOLIO LTD., HWB VICTORIA STRATEGIES PORTFOLIO, HWB PORTFOLIO PLUS, CESARE DE JULIIS, MIRTA BEATRIZ MANDOLINO, EDUARDO HECTOR SORROCHE, SUSANA ALICIA COSTA, DIEGO MARCOS SORROCHE, VERONICA SORROCHE, CHRISTA ERB, RUDOLF ERB, SILVIA BEATRIZ OVEJERO, DAVID DE LAFUENTE, JOSE L. PELUSO, HWB ALEXANDRIA STRATEGIES PORTFOLIO, ZYLBERBERG FEIN LLC, U.V.A. VADUZ, KLAUS BOHRER, AMBER REED CORP., CONSULTORA KILSER S.A., MICHAEL SCHMIDT, MARIE LAURETTE DUSSAULT, BURGHARD PILTZ, OSCAR REINALDO CARABAJAL, DORA LUISA SASAL, UTE KANTNER, SUSANA ALICIA MONKES, ALBERTO HABER, ALEJANDRO ALBERTO ETCHETO, CRISTA IRENE BRANDES, FRANCISCO MIGUEL MOLINARI, HELMUT HAGEMANN, HWB DACHFONDS-VENIVIDIVICI, HWB GOLD & SILBER PLUS, ROSA DELFINA CASTRO, GAMETOWN CORPORATION S.A., CRISTOPH HAGEMANN, DRAWRAH LIMITED, MICHELE COLELLA, DENISE DUSSAULT, ANYE SALINOVICH, DEBORA REINA COHEN, FEYSOL S.A., VANINA ANDREA EXPOSITO, BEATE NEUENHOFER, LERINERCO S.A., ANDREA DE NICOLA, INES DELIA EIDELMAN, DIEGO FABIAN TOPF, MODERN GROUP S.A., LUCABRAS S.A., CESAR CIVETTA, ALDO CIVETTA, AMANDA WIELIWIS, PABLO ALBERTO VARELA, LILA INES BURGUENO, MIRTA SUSANA DIEGUEZ, MARIA EVANGELINA CARBALLO, LEANDRO DANIEL POMILIO, SUSANA AQUERRETA, MARIA ELENA CORRAL, TERESA MUNOZ DE CORRAL, NORMA ELSA LAVORATO, CARMEN IRMA LAVORATO, CESAR RUBEN VAZQUEZ, NORMA HAYDEE GINES, MARTA AZUCENA VAZQUEZ, MAXIMO DORRA, OLGA DE DORRA DORRA, ANGEL EMILIO MOLINOS, RAUL RENNELLA AND SANDRA ELIZABETH

SCHULER, ANA ZEMBORAIN ZEMBORAIN, MIGUEL ANGEL BELOQUI, HORACIO
GUIBELALDE, MARTA MABEL FOLGADO, ARAG-A LIMITED, ARAG-O LIMITED, ARAG-
V LIMITED, ARAG-T LIMITED, GRAZIANO ADAMI, GIANFRANCO AGOSTINI, MILENA
AMPALLA, ALLAN APPLESTEIN TTEE FBO DCA GRANTOR TRUST, AUGUSTO
ARCANGELI DE FELICIS, ANTONELLA BACCHIOCCHI, ALBERTO BACIUCCO, OTELLO
BACIUCCO, FILIPPO BAGOLIN, SARA BARTOLOZZI, ANNELIESE GUNDA BECKER,
SERENELLA BELLEGGIA, GIORGIO BENNATI, ROBERTO BERARDOCCO, GRAZIELLA
BERCHI, ORSOLINA BERRA, ADRIANO BETTINELLI, MASSIMO BETTONI, STEFANO
BISTAGNINO, GIORGIO BISTAGNINO, GRAZIELLA BONADIMAN, ANDREA BONAZZI,
STEFANIA BONPENSIERE, RACHELE BONTEMPI, MARCO BORGRA, SERGIO BORGRA,
RENATA BOSCARIOL, EMANUELE BOTTI, CARLO BRETTI, SUSANNA BRETTI,
ANTONIETTA GUISEPPINA BRIOSCHI, MARCELLO CALANCA, BRUNO CALMASINI,
ITALIA CAMATO, GIUSEPPINA CAPEZZERA, LAURA ANNA CAPURRO, VINCENZO
CARBONE, CARIFIN S.A., GIOVANNI CARLOTTA, ELETTRA CASALINI, DIEGO
CASTAGNA, MARCO CAVALLI, CARMELINA CENSI, GIAN FRANCESCO CERCATO,
ALBERTO COMPARE, GIOVANNA CONNENA, AGOSTINO CONSOLINI, CESARINO
CONSOLINI, MARIA LUIGIA CONTI, SILVANA CORATO, GIANCARLO BARTOLOMEI
CORSI, FRANCESCO CORSO, GIUSEPPINA CORSO, LAURA COSCI, ANGELO COTTONI,
MONICA CROZZOLETTO, GRAZIELLA DACROCE, TARCISIA DALBOSCO, ALDO DAVID,
ANTONIO DE FRANCESCO, ANTONELLA DE ROSA KUNDERFRANCO, MANUELA DE
ROSA KUNDERFRANCO, EUFROSINA DE STEFANO, ADRIANA DELL'ERA, CARLO
FARIOLI, ANNA FERRI, GIOVANNA FERRO, FRANCESCO FOGGIATO, DONATELLA
ZANOTTI FRAGONARA, RINALDO FRISINGHELLI, ANGIOLINO FUSATO, GABRIELE
FUSATO, FELICINA GAIOLI, MADDALENA GAIOLI, GIAN CARLO GANAPINI, FRANCESCO
MAURO GHEZZI, MARIO GIACOMETTI, GIOVANNI GIARDINA, CELESTINO GOGLIA,
GIULIA GREGGIO, VERNA GUALANDI, LUISELLA GUARDINCERRI, GIANFRANCO
GUARINI, RAIMONDO IALLONARDO, INNOVAMEDICA S.P.A., FKA MATIVA S.R.I.,
MARITZA LENTI, ANGELO LEONI, PAOLO LISI, UGO LORENZI, SERGIO LOVATI,
FERNANDA ANGELA LOVERO, CARMELO MAIO, CLAUDIO MANGANO, ELIDE
MARGNELLI, CARLA MARINI DE FELICIS ARCANGLI, ROMANO MARTON, MIRCO
MASINA, GUGLIELMINA MASSARA, BRUNA MATTIOLI, SALVATORE MELCHIONDA,
MASINA MIRCO MIRCO, SIMONETTA MONTANARI, GIAMPAOLO MONTINO, CARLA
MORATA, ALESSANDRO MORATA, MARIA RITA MORETTO, AMATO MORI, BRUNO
PAPPACODA, SABRINA PARODI, ALFREDO PELLI, FRANCO PEZZE, VALERIO PIACENZA,
PERI LUIGI LUCIBELLO PIANI, EUGENIA RE, ALEESSANDRA REGOLI, BARBARA RICCHI,
MARIA ROBBIATI, PAOLA ROSA, ADRIANO ROSATO, GIUSEPPE SILVIO ROSSINI, LAURA
ROSSINI, RAFFAELE ROSSINI, RUGGERO ROSSINI, INES ROTA, HILDA RUPPRECHT,
VINCENZA SABATELLI, ANGELINA SALMISTRARO, TIZIANO SASSELLI, MARINELLA
SCALVI, MAURIZIO SERGI, SIMONA STACCIOLI, LICIA STAMPFLI-ROSA, SANTE
STEFANI, ANNA STORCHI, STUDIO LEGALE BENNATI, RENATE TIELMAN, MANUELITO

Toso, Valeria Toso, Franco Trentin, Stefania Trentin, Martino Verna, Mario Vicini, Luca Vitali, Vito Zancaner, Giovanni Zanichelli, Matteo Zanichelli, Trinity Investments Limited, Egar Ramon Lambertini, Ana Doratelli, Scoggin Capital Management II LLC, Juana Bonaiuti, Scoggin International Fund Ltd., Scoggin WorldWide Fund Ltd., Tito Siena, MCHA Holdings, LLC, Attestor Master Value Fund LP, Armando Ruben Fazzolari, Julio Roberto Perez, White Hawthorne, LLC, Jose Pedro Angulo, Pedro Timoteo Angulo, Fernando Crostelli, Juan Carlos Crostelli, Martina Crostelli, Viviana Crostelli, Patricio Hansen, Claren Corporation, Bybrook Capital Master Fund LP, Bybrook Capital Hazelton Master, Fund LP, Andrarex, Ltd., Claridae Ltd, Maria Del Pilar De We Ferrer, Stonehill Institutional Partners, LP, Stonehill Master Fund Ltd.,

*Plaintiffs - Appellants*,

Giovanni Botti, Claudio Mori, Silvia Regoli,

*Plaintiffs*,

v.

The Republic of Argentina,

*Defendant - Appellee*,

Bank of America, N.A.,

*Respondent*,

Banco Bilbao Vizcaya Argentaria, S.A., BBVA Compass Bancshares, Inc., BBVA Securities Inc.,

*Third-Party-Defendants*,

Administracion Nacional de Seguridad Social, Union de Administradoras de Fondos De Jubilacions Y Pensiones, Consolidar AFJP S.A., Arauca Bit AFJP S.A., Futura AFJP S.A., Maxima AFJP S.A., Met AFJP S.A., Origenes AFJP S.A., Profesion+Auge AFJP S.A., Unidos S.A. AFJP,

*Defendants*.

Edward A. Friedman
Daniel B. Rapport
FRIEDMAN KAPLAN SEILER
  & ADELMAN LLP
7 Times Square
New York, NY 10036
(212) 833-1100

Roy T. Englert, Jr.
Mark T. Stancil
Joshua S. Bolian
ROBBINS, RUSSELL, ENGLERT, ORSECK,
  UNTEREINER & SAUBER LLP
1801 K Street N.W., Suite 411
Washington, DC 20006
(202) 775-4500
renglert@robbinsrussell.com

*Counsel for Appellants Aurelius and Blue Angel*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for Appellants Aurelius Capital Master, Ltd., ACP Master, Ltd., Aurelius Capital Partners, LP, Aurelius Opportunities Fund II, LLC, and Blue Angel Capital I LLC state that:

Aurelius Capital Master, Ltd. ("ACM") is an exempted company with limited liability incorporated in the Cayman Islands. Aurelius Capital International, Ltd., is the parent of ACM. No publicly held corporation owns 10% or more of the stock of ACM.

ACP Master, Ltd. is an exempted company with limited liability incorporated in the Cayman Islands. Aurelius Capital Partners, LP, is the parent of ACP Master, Ltd. Aurelius Capital GP, LLC is the sole general partner of Aurelius Capital Partners, LP, and is the indirect parent of ACP Master, Ltd. No publicly held corporation owns 10% or more of the stock of ACP Master, Ltd.

Aurelius Capital Partners, LP ("ACP") is a limited partnership organized and existing under the laws of the State of Delaware. ACP is not a corporation and therefore Rule 26.1 does not require any disclosures with respect to it.

Aurelius Opportunities Fund II, LLC ("AOF") is a limited liability company organized and existing under the laws of the State of Delaware. AOF is not a corporation and therefore Rule 26.1 does not require any disclosures with respect to it.

Blue Angel Capital I LLC ("Blue Angel") is a limited liability company organized and existing under the laws of the State of Delaware. Blue Angel is not a corporation and therefore Rule 26.1 does not require any disclosures with respect to it.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ......................................... i

TABLE OF AUTHORITIES .................................................v

INTRODUCTION ........................................................1

JURISDICTION.........................................................4

ISSUES PRESENTED....................................................4

STATEMENT ..........................................................5

    A.    Argentina Breaches Its Contract, Prompting The Courts To Enter And Affirm The Injunctions...........................................5

    B.    The District Court Enters Similar Injunctions For "Me Too" Plaintiffs ...........................................................11

    C.    Argentina Announces A Tender Offer After A Few Negotiation Meetings, And The District Court Issues Its Indicative Ruling .........13

    D.    This Court Dismisses The Pending Appeals Subject To Conditions ...................................................19

    E.    Lead Plaintiffs Reach An Agreement In Principle With Argentina, And The District Court Issues The Order On Appeal .......20

SUMMARY OF ARGUMENT................................................26

STANDARD OF REVIEW ................................................28

ARGUMENT ..........................................................28

I.    The Standard For Vacating The Injunctions Is Not Satisfied Here ..............28

    A.    The District Court Lacked Discretion To Vacate The Injunctions Unless There Was A Significant Change In Circumstances And The Injunctions' Purpose Had Been Achieved....................................29

**TABLE OF CONTENTS (continued)**

**Page**

B.    The Change In Circumstances Here Frustrates Rather Than Effectuates The Injunctions' Purpose Of Ensuring That Argentina Performs Its Obligations Under The Pari Passu Clause ...................................................................................31

C.    Revisionist History In Which The Injunctions' Purpose Is To Effect Settlement Cannot Justify The District Court's Order .............35

II.    If The Court Affirms The Order, It Should Hold That The Order Means What It Says When It Requires Payment "In Accordance With The Specific Terms Of" Agreements Reached By February 29 ...................39

CONCLUSION .......................................................................................49

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

iv

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bd. of Educ. of Oklahoma City Pub. Sch. v. Dowell*,
  498 U.S. 237 (1991) ...................................................................... 31, 34

*Benjamin v. Jacobson*,
  172 F.3d 144 (2d Cir. 1999) ................................................................45

*Chrysler Corp. v. United States*,
  316 U.S. 556 (1942) ...........................................................................28

*EM Ltd. v. Republic of Argentina*,
  No. 03 Civ. 2507, 2003 WL 22120745 (S.D.N.Y. Sept. 12, 2003) ........................6

*Goss Graphics Sys., Inc. v. DEV Indus., Inc.*,
  267 F.3d 624 (7th Cir. 2001) ...............................................................37

*Griggs v. Provident Consumer Disc. Co.*,
  459 U.S. 56 (1982) (per curiam) .........................................................19

*Horne v. Flores*,
  557 U.S. 433 (2009) ...........................................................................28

*In re Benedict*,
  90 F.3d 50 (2d Cir. 1996) ...................................................................45

*Inmates of Suffolk Cnty. Jail v. Rouse*,
  129 F.3d 649 (1st Cir. 1997) ...............................................................45

*Kass v. Kass*,
  696 N.E.2d 174 (N.Y. 1998) ...............................................................46

*Kothe v. Smith*,
  771 F.2d 667 (2d Cir. 1985) ...............................................................37

*Lightwater Corp. v. Republic of Argentina*,
  No. 02 Civ. 3804, 2003 WL 1878420 (S.D.N.Y. Apr. 14, 2003) ...........................7

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

*Maduakolam v. Columbia Univ.*,
 866 F.2d 53 (2d Cir. 1989) ................................................................29

*Motorola Credit Corp. v. Uzan*,
 561 F.3d 123 (2d Cir. 2009) ..............................................................30

*NML Capital, Ltd. v. Republic of Argentina*,
 699 F.3d 246 (2d Cir. 2012) ...................................................... *passim*

*NML Capital, Ltd. v. Republic of Argentina*,
 727 F.3d 230 (2d Cir. 2013) .................................................... 8, 10, 33

*NML Capital, Ltd. v. Republic of Argentina*,
 No. 08 Civ. 6978, 2015 WL 1087488 (S.D.N.Y. Mar. 12, 2015) .......................12

*NML Capital, Ltd. v. Republic of Argentina*,
 No. 08 Civ. 6978, 2016 WL 836773 (S.D.N.Y. Mar. 2, 2016) ............................5

*NML Capital, Ltd. v. Republic of Argentina*,
 No. 11 Civ. 4908, 2016 WL 715732 (S.D.N.Y. Feb. 19, 2016) ...........................5

*Republic of Argentina v. NML Capital, Ltd.*,
 134 S. Ct. 201 (2013) ........................................................................10

*Republic of Argentina v. NML Capital, Ltd.*,
 134 S. Ct. 2819 (2014) ......................................................................10

*Rogers v. 66-36 Yellowstone Blvd. Coop. Owners, Inc.*,
 599 F. Supp. 79 (E.D.N.Y. 1984) ......................................................30

*Rufo v. Inmates of Suffolk Cnty. Jail*,
 502 U.S. 367 (1992) ..........................................................................30

*Ruotolo v. City of New York*,
 514 F.3d 184 (2d Cir. 2008) ..............................................................30

*SEC v. Warren*,
 583 F.2d 115 (3d Cir. 1978) ..............................................................34

**TABLE OF AUTHORITIES (continued)**

Page(s)

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  732 F.2d 253 (2d Cir. 1984) ............................................................ 28, 30, 31, 35

*United States v. Eastman Kodak Co.*,
  63 F.3d 95 (2d Cir. 1995) ........................................................................ 31, 35, 36

*United States v. Swift & Co.*,
  286 U.S. 106 (1932) ..................................................................................................30

*United States v. United Shoe Mach. Corp.*,
  391 U.S. 244 (1968) ..................................................................................................31

*W. Elec. Co. v. Solitron Devices, Inc.*,
  306 N.Y.S.2d 624 (N.Y. App. Div. 1970)...............................................................46

**Statutes and Rules**

28 U.S.C. § 1292(a)(1) .....................................................................................................4

28 U.S.C. § 1330(a) ..........................................................................................................4

28 U.S.C. § 1603(a) ..........................................................................................................4

28 U.S.C. § 1961(a) ..........................................................................................................7

Fed. R. Civ. P. 60(b) .......................................................................................................29

Fed. R. Civ. P. 60(b)(5) ............................................................................................ 29, 30

Fed. R. Civ. P. 60(b)(6) ..................................................................................................29

Fed. R. Civ. P. 62.1(a) ......................................................................................................5

Fed. R. Civ. P. 62.1(a)(3)................................................................................................18

N.Y. C.P.L.R. 5004...........................................................................................................7

S.D.N.Y. L. Civ. R. 6.1(b)(2) .........................................................................................18

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

**Other Authorities**

Buenos Aires Herald, *Gov't Will Issue New Debt After Boden 2015 Payment*
(Oct. 3, 2015), http://bit.ly/1TTSUey ..................................................................12

Reuters, *Argentina To Issue $2 bln of 2016 Bonds To Settle Importers' Debt*
(Dec. 18, 2015), http://reut.rs/1P4Mi4G ............................................................12

# INTRODUCTION

This brief is filed on behalf of Appellants Aurelius Capital Master, Ltd., ACP Master, Ltd., Aurelius Capital Partners, LP, Aurelius Opportunities Fund II, LLC, and Blue Angel Capital I LLC ("Aurelius and Blue Angel"). Aurelius and Blue Angel are (along with NML Capital, Olifant Fund Ltd., and related entities) part of the group commonly referred to in these cases as the Lead Plaintiffs. Lead Plaintiffs together hold about 65% of the claims at issue in this litigation.

This appeal concerns an effort by the Republic of Argentina to tear apart—in a matter of weeks—certain permanent injunctions (the "Injunctions") that were years in the making. The basis for seeking such swift and dramatic relief was *not* that Argentina had finally started paying holders of its defaulted bonds or made other provisions to comply with its contractual obligations. Rather, Argentina sought relief from the Injunctions based solely on a plan that mixed hope with coercion.

The plan was launched on February 5, shortly after Argentina began negotiating with creditors under the administration of its newly elected president. Argentina issued a public tender offer to give the vast majority of creditors a haircut dictated by Argentina. Six days later, holders of just 4.8% of the claims protected by the Injunctions had agreed in principle to settle for a discount—and another 9.5% had "agreed" to accept 100% payment of their claims. Based on such a

modest change of circumstances, Argentina sought a ruling that would take important protections away from every other creditor.

The ruling that Argentina sought was an order imposing steep consequences for any creditor that did not promptly cut a deal. Woe unto those who did not accept Argentina's unilaterally announced terms by February 29: The requested order promised that the Injunctions would be lifted across the board—even as to non-settling plaintiffs—if Argentina consummated the agreements reached by February 29. The details were new, but the plan bore a resemblance to Argentina's exchange offers in 2005 and 2010, in which Argentina dictated terms to holdout creditors and threatened never to pay them if they did not accept.

Without any finding that Argentina's February 29 deadline was necessary or appropriate, the district court demanded expedited briefing. Just four hours after briefing was complete—and despite plaintiffs' multiple requests for a hearing—the district court issued a 23-page Indicative Ruling saying that, once this Court remanded certain then-pending appeals, it would indeed leave non-settling creditors unprotected. Thus, the overwhelming majority of creditors had just ten days to come to terms with Argentina or face losing the only remedy that had ever forced Argentina to honor its contract obligations. Even after this Court made clear that the district court should give creditors a full opportunity to be heard, the district

court paid only lip service to those instructions and promptly entered the Order after remand.

The Lead Plaintiffs are among the lucky ones. They were able to reach an agreement in principle with Argentina before the February 29 deadline. So why are Aurelius and Blue Angel appealing? *First and foremost*, the Order rests on the erroneous premise that "changed circumstances" necessary to warrant lifting the Injunctions exist solely on the basis of Argentina's *hope* that it will pay some subset of creditors who agreed to terms under coercive conditions. To be clear, we sincerely hope that Argentina will pay in full under our settlement agreement. But since that is far from certain—and we may find ourselves again defending the Injunctions against further attacks by Argentina—this Court should correct the district court's misimpression that Argentina may obtain even conditional relief from the Injunctions simply by claiming a willingness to settle.

*Second*, within hours of inking the Lead Plaintiffs' settlement agreement, Argentina made clear its intent to read the district court's Order to allow Argentina, in certain circumstances, *not* to pay Lead Plaintiffs and yet still lift the Injunctions. The parties agreed that, if Argentina did not make full payment by a date certain, Lead Plaintiffs would have the option to terminate the agreement. But Argentina has since declared that if it *fails* to pay by the specified date (though it is completely capable of paying at any time) and Lead Plaintiffs exercise their termination

right, the district court's Order nonetheless permits it to pay *other* settling creditors and thereby claim that it has "ma[d]e full payment in accordance with the specific terms of each" agreement reached by February 29. Under Argentina's reading of the Order, then, it can end up paying just 19.2% of the claims and succeed in lifting *all* of the Injunctions. Again, we hope that Argentina will pay the full amounts owed under our settlement agreement. But, if this Court is inclined to affirm, then it should make clear that the Order does not permit Argentina's gamesmanship.

## JURISDICTION

The district court had jurisdiction because Argentina is a foreign state that has waived immunity. See 28 U.S.C. §§ 1330(a), 1603(a). This Court has jurisdiction because, in the challenged order, the district court vacated injunctions. See *id.* § 1292(a)(1). The district court entered the challenged order on March 2, 2016, and Aurelius and Blue Angel filed notices of appeal the next day.

## ISSUES PRESENTED

1.      Whether the district court erred by vacating the Injunctions in the absence of changed circumstances establishing that the purpose of the Injunctions has been achieved and, indeed, vacatur will frustrate the purpose of the Injunctions.

2.      Whether, if this Court affirms the Order, it should hold that the Order permits vacatur of Lead Plaintiffs' Injunctions only if Argentina makes payment in

4

full under the Lead Plaintiffs' agreement, and not if the agreement is terminated according to its terms.

## STATEMENT

These cases arise from Argentina's breach of its contractual obligations. To remedy that breach, the district court (Griesa, J.) entered injunctions ordering specific performance. Argentina subsequently moved the district court to vacate those injunctions upon the satisfaction of two conditions. The injunctions were then on appeal to this Court, but the district court entered an indicative ruling (see Fed. R. Civ. P. 62.1(a)) that it would grant Argentina's motion. *NML Capital, Ltd. v. Republic of Argentina*, No. 11 Civ. 4908, 2016 WL 715732 (S.D.N.Y. Feb. 19, 2016). This Court then dismissed the pending appeals, *Aurelius Opportunities Fund II, LLC v. Republic of Argentina*, No. 15-1060 (2d Cir. Feb. 24, 2016), and the district court entered an order formalizing its indicative ruling, *NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 6978, 2016 WL 836773 (S.D.N.Y. Mar. 2, 2016).

### A. Argentina Breaches Its Contract, Prompting The Courts To Enter And Affirm The Injunctions

1. Appellants, plaintiffs below, hold bonds that Argentina issued pursuant to a Fiscal Agency Agreement (FAA). In addition to requiring Argentina to pay holders of FAA Bonds, the FAA contains various protections for investors. One of those protections, known as the "Pari Passu Clause," has been central to this litiga-

tion.  See *NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246, 251 (2d Cir. 2012) ("*NML I*").  That Clause provides that the FAA Bonds

> will constitute . . . direct, unconditional, unsecured and unsubordinated obligations of the Republic and shall at all times rank *pari passu* without any preference among themselves.  The payment obligations of the Republic under the [FAA Bonds] shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness.

*Ibid.* (emphasis omitted).

The FAA governs multiple classes of bonds, the economic terms of which vary considerably from class to class.  For example, the maturity dates on the bonds vary from 2005 to 2031, and the fixed coupon rates vary from 9.75% to 15.5%.  *Ibid.*  Some of the bonds have floating coupon rates instead of fixed rates. A-1936-1937.  Although the details are not important, the variation among interest rates on the FAA Bonds is significant.

Argentina defaulted on its bonds, including the FAA Bonds, in 2001.  *NML I*, 699 F.3d at 251.  That year, it enacted a "temporary moratorium" on payments under the FAA Bonds.  *Ibid.*  It renewed that moratorium every year, so holders of FAA Bonds received no principal or interest payments.  *Ibid.*

Some holders of FAA Bonds sued Argentina just after it defaulted.  The district court entered money judgments for these bondholders as early as 2003. *E.g.*, *EM Ltd. v. Republic of Argentina*, No. 03 Civ. 2507, 2003 WL 22120745 (S.D.N.Y. Sept. 12, 2003); *Lightwater Corp. v. Republic of Argentina*, No. 02 Civ.

3804, 2003 WL 1878420 (S.D.N.Y. Apr. 14, 2003). Those judgments have accrued interest at a post-judgment rate tied to Treasury yields, which have been low. 28 U.S.C. § 1961(a). Other holders of FAA Bonds waited to sue or, if they sued, did not reduce their claims to judgment. Their claims thus accrued interest at the higher rates provided by their bonds and/or New York law. See N.Y. C.P.L.R. 5004.

In 2005, Argentina tried to stamp out its investors' grievances. It directed holders of FAA Bonds to swap their bonds for different bonds, known as "Exchange Bonds." *NML I*, 699 F.3d at 252. These bonds were "worth only 25-29% of the FAA [B]onds' value." Indicative Ruling, SPA-48. At the same time, Argentina enacted Law 26,017, known as the "Lock Law." *NML I*, 699 F.3d at 252. The Lock Law, among other things, barred Argentina from settling with holders of outstanding FAA Bonds. *Ibid.* Despite Argentina's threats never to make payment on the FAA Bonds, only 76% of eligible investors swapped their bonds. *Ibid.* In 2010, Argentina re-opened the exchange, increasing the participation rate to 91%. *Id.* at 253.

From 2005 onward, Argentina made regular payments on its Exchange Bonds. *Ibid.* However, in accordance with its Lock Law and numerous statements it made, see *id.* at 252-53, it refused to make payments on outstanding FAA Bonds. Moreover, it refused to honor judgments secured by holders of FAA Bonds who

7

had sued. The plaintiffs' efforts to secure effective pre-judgment relief and to collect on their judgments proved virtually impossible.

2. Argentina's actions following its 2005 exchange breached the Pari Passu Clause. In that Clause, Argentina had promised to "rank" payments on the FAA Bonds "at least equally with" payments on certain other bonds. *NML I*, 699 F.3d at 251. But it was making payments on its Exchange Bonds (which fall within the Clause's scope) while taking extraordinary steps to avoid responsibility for its FAA Bonds. By so doing, Argentina "ranked its payment obligations to the [holders of FAA Bonds] below those of the [E]xchange [B]ondholders." *Id.* at 259.

To remedy Argentina's breach, Lead Plaintiffs moved the district court to enter the Injunctions. The Injunctions compel Argentina "to specifically perform its obligations" under the FAA. *Id.* at 254. In particular, they require that, before Argentina makes any payment on its Exchange Bonds, it must make a "ratable payment" to Lead Plaintiffs. *Ibid.* Under the "ratable payment" formula, "if Argentina pays Exchange Bondholders 100% of what has come due on their bonds at a given time, it must also pay plaintiffs 100% of the . . . principal and accrued interest that they are currently due." *NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d 230, 239 (2d Cir. 2013) ("*NML II*").

The district court entered the Injunctions in February 2012. A-533-538. To justify the Injunctions, the district court held:

8

- "Absent equitable relief, [Lead Plaintiffs] would suffer irreparable harm because the Republic's payment obligations to [Lead Plaintiffs] would remain debased of their contractually-guaranteed status";

- "There is no adequate remedy at law for the Republic's ongoing violations . . . because the Republic has made clear . . . its intention to defy any money judgment issued by this Court";

- "The balance of the equities strongly supports this Order in light of the clear text of [the Pari Passu Clause] and the Republic's repeated failures to make required payments"; and

- "The public interest of enforcing contracts and upholding the rule of law will be served by the issuance of this Order . . . .  No less than any other entity entering into a commercial transaction, there is a strong public interest in holding the Republic to its contractual obligations."

A-534-535.

This Court affirmed.  *NML I*, 699 F.3d 246.  Echoing the district court, this Court noted that the Injunctions were "designed to remedy Argentina's failure to pay bondholders."  *Id.* at 250.  They "direct Argentina to comply with its contractual obligations not to alter the rank of its payment obligations."  *Id.* at 262.  Lead Plaintiffs, this Court held, were "completely within their rights to reject the 25-cents-on-the-dollar exchange offers."  *Id.* at 263 n.15.  No matter how badly Argentina wanted a restructuring on its terms—and even though "a super-majority" of investors had agreed—"Argentina has no right to force [Lead Plaintiffs] to accept a restructuring."  *Ibid.*  Lead Plaintiffs retained their contractual rights, and those rights should be vindicated.

When this Court affirmed, it ordered a limited remand for the district court to "clarify" "two issues." *Id.* at 250-51. The Court retained jurisdiction and, after the district court made the requested clarification, again affirmed. *NML II*, 727 F.3d 230. The Supreme Court denied the petitions for *certiorari* that Argentina filed following each of this Court's affirmances. *Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2819 (2014); *Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 201 (2013).

3.     The Injunctions had been stayed pending more than two years of appellate litigation. See *NML II*, 727 F.3d at 238. When the Supreme Court denied *certiorari* in June 2014, however, the Injunctions took effect. Argentina could obey the Injunctions in one of two ways: It could pay both Lead Plaintiffs and the Exchange Bondholders, or it could pay neither.

Argentina, however, had declared to this Court that it "would not voluntarily obey" the Injunctions. *Ibid.* True to its word, Argentina repeatedly attempted to make a prohibited payment on the Exchange Bonds while persisting in refusing to make payment on the FAA Bonds. *E.g.*, A-1139-1141. Third parties responsible for processing the payments, facing the possibility of contempt, declined to do so. Trying to dodge that issue, Argentina enacted Law 26,984, dubbed the "Sovereign Payment Law." A-1143-1148. Among other things, this law purported to replace the U.S.-based payment processor with an Argentine one. *Ibid.* For all of these

10

reasons, and others, the district court held Argentina in contempt. A-9730-9732; A-244-246. That contempt remains unpurged.

Amidst Argentina's contumacy, the district court *sua sponte* appointed a Special Master "to conduct and preside over settlement negotiations." A-593. Lead Plaintiffs were willing to discuss settlement. Argentina was not. Indicative Ruling, SPA-51, -60.

## B.    The District Court Enters Similar Injunctions For "Me Too" Plaintiffs

Beyond Lead Plaintiffs, there are other holders of defaulted FAA Bonds. These other bondholders lacked the protection of the Injunctions entered in 2012. After the Injunctions were first entered in 2012, many of these other holders of FAA Bonds, known in this case as the "me too" plaintiffs, sought the same relief. Indicative Ruling, SPA-51.[1] In October 2015, the district court granted their motions, entering additional Injunctions for the "me too" plaintiffs. *Id.* at SPA-52. These Injunctions are functionally identical to the Injunctions entered in 2012.

Argentina promptly appealed the Injunctions entered in favor of the "me too" plaintiffs. See *NML Capital, Ltd. v. Republic of Argentina*, No. 15-3675(L) (2d Cir.). Meanwhile, Argentina had sought to narrow the scope of the original Injunctions entered in Lead Plaintiffs' cases, and the district court had denied

---

[1]    Some Lead Plaintiffs also sought "me too" relief for their bonds that had not been subject to the previous litigation.

Argentina's motion. See *NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 6978, 2015 WL 1087488 (S.D.N.Y. Mar. 12, 2015). Argentina appealed that ruling as well. See *Aurelius Opportunities Fund II, LLC v. Republic of Argentina*, No. 15-1060(L) (2d Cir.). Thus, by the end of 2015, all of the Injunctions—both in Lead Plaintiffs' cases and in the "me too" cases—were on appeal before this Court.

Throughout 2015, while the Injunctions were in effect, Argentina raised capital through certain debt instruments and financing transactions. For example, in April 2015, Argentina sold $1.4 billion of bonds to investors around the world. Buenos Aires Herald, *Gov't Will Issue New Debt After Boden 2015 Payment* (Oct. 3, 2015), http://bit.ly/1TTSUey; see also Reuters, *Argentina To Issue $2 bln of 2016 Bonds To Settle Importers' Debt* (Dec. 18, 2015), http://reut.rs/1P4Mi4G (announcing issuance of $2 billion of bonds). However, the Injunctions continued to bar Argentina from making payments on the Exchange Bonds.[2]

---

[2] Any such issuances or transactions may be subject to the Pari Passu Clause, and Lead Plaintiffs reserve all rights and remedies in that regard. As explained below, see *infra* at 14, 25, that is precisely the point: Even in the shadow of the Pari Passu Clause and the Injunctions enforcing it, the market has shown a willingness to support Argentina's financial transactions. The notion that the Injunctions must be swept away before Argentina can raise additional funds is not only unsupported; it is demonstrably false.

**C.**   **Argentina Announces A Tender Offer After A Few Negotiation Meetings, And The District Court Issues Its Indicative Ruling**

1.   On November 22, 2015, Argentine voters elected a new president, Mauricio Macri.  Indicative Ruling, SPA-52-53.  Mr. Macri assumed office on December 10 and appointed a new administration.  A-666.  According to the new Undersecretary of Finance, Mr. Macri's administration has a "strong commitment" to resolving this litigation.  A-667.  He noted, however, that any settlements "are subject to the prior approval of the Congress of the Republic."  *Ibid.*  The party of Argentina's previous president—Cristina Fernández de Kirchner, who opposed any settlements with holdout creditors and led the country into contempt—continues to control its Senate.

Argentina's new administration sent preliminary signals that it was, in fact, willing to resolve this litigation.  In December, Argentina's representatives met with the Special Master.  *Ibid.*  On January 13, 2016, the Special Master convened a meeting with Argentina, Lead Plaintiffs, and two other large holders of FAA Bonds, EM Limited and Montreux.[3]  The meeting lasted an hour and a half and "focused on process."  A-1644-1645.  The same group met again for two hours on February 1.  A-1645.  There, Argentina "outlined [its] preliminary thoughts about [its] willingness to pay."  *Ibid.*

---

[3]   "Montreux" refers to a group of four affiliated entities: Montreux Partners, L.P., Los Angeles Capital, Cordoba Capital, and Wilton Capital, Ltd.

13

Argentina also continued to bolster its cash reserves. On January 29, Argentina announced that it was borrowing an additional $5 billion from global banks. A-1197-1199. This infusion of cash boosted Argentina's reserves to $29.7 billion, A-1189-1191, far more than the total claims made by holders of FAA Bonds.

On February 3, Argentina reached agreements with two holders of FAA Bonds. In its agreement with EM Limited—which held 9.5% of the claims protected by the Injunctions—Argentina agreed to pay the *full amount* of the claim asserted. A-719-721. Although Argentina touted this as a "settlement," the district court recognized that "the notion of 'settlement' implies" receiving "less than the full claim." Indicative Ruling, SPA-68. In its agreement with Montreux—which held 4.8% of the claims protected by the Injunctions—Argentina agreed to pay 72.5% of the claim asserted. A-717. Thus, Argentina agreed to pay 9.5% of the claims in full, and settled an additional 4.8%.

The negotiations, however, had barely started when Argentina called a halt. On February 4, Lead Plaintiffs presented Argentina with a term sheet for a settlement. A-1645. Rather than negotiating, however, Argentina's representatives "stated that they planned to leave for Buenos Aires on a flight that evening" and "left the meeting immediately." *Ibid.* At least Lead Plaintiffs were able to meet (albeit abortively) with Argentina. Weeks later, numerous other holders of FAA

14

Bonds stated that, even then, Argentina had declined to open negotiations with them.  A-2280-2281, -2286, -2290, -2293, -2296.

2.     The day after Argentina's representatives decamped for Buenos Aires, Argentina publicly announced its real strategy—floating a tender offer and seeking to undermine the protections of those bondholders who did not accept.  A-645-649.  As in its 2005 and 2010 exchanges, Argentina offered a fixed set of terms to all holders of FAA Bonds in exchange for "waiv[ing] all of their rights."  A-646.  The tender offer was "subject to the approval of [Argentina's] Congress as well as to [a] judicial decision ordering the lifting of the . . . Injunctions."  A-647.

The tender offer provided FAA Bond holders with two options: a "standard offer" and a "pari passu offer."  Indicative Ruling, SPA-53-54.  The "standard offer" provided that any holders of FAA Bonds could receive 150% of their principal amounts (up to the full amount of their claims), regardless how much interest had accrued on their claims since the default.  *Id.* at SPA-53.  The "pari passu offer" was open only to those who held the Injunctions—that is, to Lead Plaintiffs and to the "me too" plaintiffs.  *Ibid.*  It provided that the bondholder could receive 70% (or 72.5%, if accepted by February 19) of their legal claims (including accrued interest).  *Ibid.*

It is undisputed that the tender offer yielded wildly disparate results for bondholders, depending on the amount of interest each holder had accrued.  Some

15

holders of FAA Bonds had accrued interest that was 50% or less of the principal amount. Those bondholders, such as EM, could accept the "standard offer," yet have their claims paid in full. See A-715. Many other bondholders, however, had accrued interest that was much more than 50% of the principal amount of their bonds. For them, the principal-plus-50% of the "standard offer" imposed a staggering haircut, far worse than the 70% of the claim available through the "pari passu offer."

3. Less than a week after announcing its tender offer, Argentina revealed the final piece of its plan. It moved *ex parte*, by order to show cause, for the district court to vacate the only adequate remedy for Argentina's breach of the FAA—the Injunctions. The proffered reason was *not* that Argentina intended to begin honoring the FAA. To the contrary, the apparent goal was for Argentina to pressure as many bondholders as possible into accepting the tender offer, and then Argentina would resume its breach and begin paying the Exchange Bondholders without paying the remaining FAA Bondholders.

Argentina made three primary arguments in support of its request for this extraordinary relief. First, it claimed that circumstances had changed due to (a) President Macri's attitude toward this litigation; (b) the EM and Montreux agreements; and (c) the smattering of negotiations. (Never mind that negotiations

had barely started, and that only Montreux—with a mere 4.8% of claims—had *settled* for less than 100% of its claim.)

Second, Argentina asserted that, "without an order vacating the injunctions . . . , it will be difficult for Argentina to raise funds with which to pay the settlements." A-669. (Never mind that Argentina, the moving party, presented zero evidence to support this claim and that the evidence is to the contrary. See *supra* at 12, 14.)

Third, Argentina wanted the vacatur conditioned on the occurrence of two conditions precedent (both of which were entirely within its control):

- Argentina would "repeal or otherwise abridge" the Lock Law and the Sovereign Payment Law; and

- Argentina would make payment to any and all parties "that enter[] into a settlement agreement . . . on or before February 29, 2016" "in accordance with the specific terms of each such Settlement Agreement."

See A-452. As the second condition precedent made plain, Argentina's real goal was a judicial order that would coerce bondholders into settling by February 29, or else risk losing their Injunctions. Argentina never even attempted to justify its February 29 deadline; it stated only that Argentina's Congress would be in session the next day. Nor did it even try to explain why the district court should consider the motion before Argentina's Congress had actually repealed the Lock Law— which would have been a good-faith first step after so many years of recalcitrance.

17

The district court entered the order to show cause, A-450-453, and the procedural steps that ensued were not exactly by the book. Argentina never tried to show that an emergency existed. Rather, it merely announced its arbitrary February 29 deadline and offered its unsupported claim about needing to raise funds (and purported inability to do so without relief from the Injunctions). Nonetheless, the district court granted Argentina's request to make the plaintiffs' response due less than five days later. A-453. Plaintiffs sought and obtained a two-day extension. A-699. Still, that is half the time ordinarily allowed. S.D.N.Y. L. Civ. R. 6.1(b)(2). Plaintiffs also made two written requests for a hearing, but none was held.

Just a day after Lead Plaintiffs had filed their response, and just four hours after Argentina had filed its reply, the district court produced a 23-page Indicative Ruling. SPA-35-69. Due to the appeals pending in this Court, the district court lacked jurisdiction to grant Argentina's motion outright. *Id.* at SPA-55.[4] However, it stated that it "would grant the motion if the court of appeals remands for that purpose." See Fed. R. Civ. P. 62.1(a)(3). The court held that "changed circumstances have rendered the injunctions inequitable." Indicative Ruling, SPA-59. The "[m]ost important[]" factor in the district court's decision was Argentina's newfound "willingness to negotiate." *Ibid.* The district court also relied on the

---

[4]   The district court entered the Indicative Ruling only in the "me too" cases. However, appeals were pending in all cases.

agreements that had been reached to date, *id.* at SPA-60, -63, and the two conditions precedent, *id.* at SPA-61, -63.

Even as they continued to litigate, Lead Plaintiffs sought to negotiate with Argentina. The day before the Indicative Ruling, Lead Plaintiffs met with Argentina and the Special Master for over eight hours. A-1694. Around the same time, Argentina entered into agreements with a handful of small holders of FAA Bonds. A-1670; A-1938-1939.

### D.    This Court Dismisses The Pending Appeals Subject To Conditions

The district court entered only an Indicative Ruling, rather than granting Argentina's motion outright, because appeals were pending in this Court. See *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982) (per curiam). At the time of the Indicative Ruling, both the original cases filed by Lead Plaintiffs and the "me too" cases were on appeal. See *supra* at 11-12.

Oral argument had been scheduled in the appeals regarding the Injunctions' scope for February 24, just five days after the Indicative Ruling. Argentina moved briskly to prevent that oral argument. It filed two emergency motions: one to dismiss its appeals regarding the Injunctions' scope; the other to remand the appeals in the "me too" cases. Lead Plaintiffs opposed both motions and, in addition, moved to refer all of Argentina's motions to the panel constituted for oral argument (Raggi, Hall, Walker, JJ.).

19

The Court held oral argument as scheduled. It expressed concern about the district court's refusal to hold a hearing before entering the Indicative Ruling. For example, Judge Raggi noted that, in the absence of "an opportunity to be heard," if the district court "just enters an indicative ruling, you have an automatic appeal, and probably a very successful one." A-1830. At the conclusion of the hearing, Argentina agreed to dismiss both sets of appeals with prejudice. It also agreed that, "[b]efore the indicative ruling is formally entered as an order," Argentina would move for that relief and allow all interested parties to be heard in the district court. A-1721. Finally, Argentina "agree[d] to a stay of up to two weeks of any district court order formalizing the indicative ruling," to facilitate orderly appeals. *Ibid.*

Subject to these conditions to which Argentina had agreed, this Court dismissed both sets of appeals the same day. *Ibid.*

### E. Lead Plaintiffs Reach An Agreement In Principle With Argentina, And The District Court Issues The Order On Appeal

Less than 24 hours after dismissal of the appeals, rather than engaging in the formal motion practice anticipated by this Court, Argentina sent a 121-word letter to the district court. A-1722-1723. It requested that the district court "schedule a hearing" on formal entry of the Indicative Ruling "at [the court's] earliest convenience." A-1723. A few hours later, the court set a schedule. A-1742. Any additional papers would be due at noon on Monday, February 29, and the hearing would take place the following afternoon. Plaintiffs promptly sought to amend the

20

schedule to comport with the local rules and to provide more than two business days in which to prepare submissions. The district court declined. A-1756.

Meanwhile, Lead Plaintiffs continued to negotiate with Argentina and, shortly before the February 29 deadline, reached an Agreement in Principle (AIP). A-2366-2377. Under the AIP, Argentina agreed to pay 75% of Lead Plaintiffs' claims, plus specified fees and interest. A-2366.

A central issue, however, was timing. The Argentine Congress still had to act, and Argentina wanted to raise the settlement funds in the capital markets, rather than to use its existing reserves. Plaintiffs did not want to be kept waiting indefinitely for either of these things to happen. Argentina therefore agreed that, if it had failed to pay by April 14, then any Lead Plaintiff may—at its sole option— terminate the AIP as to itself. AIP ¶ 10, A-2371. If termination occurs, "the terminating Plaintiffs and the Republic of Argentina . . . shall thereupon be restored to their respective prior positions as if there had been no Agreement in Principle." *Ibid.* In other words, Lead Plaintiffs would retain all of their rights under the Injunctions in the event the AIP terminated.

Importantly, all agreed that the AIP "qualifies as an agreement in principle . . . entered into on or before February 29, 2016 as contemplated by the Court's indicative order." *Ibid.* Accordingly, were Lead Plaintiffs to terminate the AIP because Argentina had not made timely payment, Argentina could no longer "make

21

full payment in accordance with the specific terms of" all agreements it reached on or before February 29. See Indicative Ruling, SPA-69. And that would make it impossible to satisfy the Indicative Ruling's conditions precedent. *Ibid.*

The parties agreed that Lead Plaintiffs' Injunctions may be "automatically vacated" only "upon the receipt of the final payment" to Lead Plaintiffs. AIP ¶ 5, A-2367. The AIP was not conditioned on Argentina successfully lifting all of the Injunctions or obtaining any ruling at issue in this appeal. Moreover, the parties agreed that, while the AIP was in force, Argentina may "not request the Court to vacate or modify the Injunctions . . . other than automatically upon payment in full to the Plaintiffs." *Id.* at A-2367-2368. In other words, Lead Plaintiffs' Injunctions would lift only upon payment—and Argentina promised that it would not seek to have the Injunctions lifted for any other reason. Argentina soon broke this promise.

The AIP reserved Lead Plaintiffs' right to "safeguard their legal position," AIP ¶ 6, A-2368, and they did so. The day after signing the AIP, Lead Plaintiffs filed a brief contesting the Indicative Ruling. The main reasons were twofold: (i) the Indicative Ruling committed in advance to lift the Injunctions, based not on actual progress toward settlement assessed at the time the Injunctions were lifted, but on Argentina's (possible) future fulfillment *only* of agreements entered into by Argentina's arbitrary and unnecessary February 29 settlement deadline (even

22

though Lead Plaintiffs had met it), and (ii) the district court should determine whether to vacate the Injunctions on a plaintiff-by-plaintiff basis, not lift the Injunctions across all cases.  Finally, Lead Plaintiffs requested a clarification that the AIP's termination provision would operate as intended:  "For the avoidance of doubt, if Plaintiffs do not receive full payment in accordance with the specific terms of the AIP for any reason, including if Plaintiffs terminate the AIP [pursuant to the termination provision described above], the Injunctions shall remain in place."  See A-1860; A-2312-2313.

The parties filed briefs shortly before the noon, Monday, deadline.  The next day, the district court convened the hearing.  Fifteen lawyers spoke.  See A-2256-2310.  Each was given eight minutes for argument and two for rebuttal.  The district court asked no questions.

At the hearing, Argentina challenged the clarification that Lead Plaintiffs had requested.  Argentina argued for a construction of the AIP and the court's Indicative Ruling that, if Lead Plaintiffs exercised their termination rights, would exclude Lead Plaintiffs from "the group of people who are entitled to payment prior to the relief from the injunctions."  A-2300-2301.  That is, Argentina made clear that it was actually seeking an order that would vacate Lead Plaintiffs' Injunctions even if the agreement terminated *without* payment.  As long as Argentina paid everyone else with a February agreement—representing a mere 19.2% of the

23

overall pari passu claims—it could lift the Injunctions across the board. Argentina's counsel did not explain why Lead Plaintiffs would have bargained for a termination right that stood only to help Argentina.

In addition to disputing the basic propriety of the Order, counsel for numerous plaintiffs alternatively urged the district court to delay its entry. Counsel explained that many plaintiffs had been denied *any* opportunity to negotiate via the Special Master or directly with Argentina. A-2280-2281, -2286, -2290, -2293, -2296. Those plaintiffs had (as in 2005 and 2010) simply received an ultimatum to accept the public tender offer, despite the stated premise of the Indicative Ruling that Argentina was committed to negotiating. To make matters worse, the district court's Indicative Ruling promised to require payment only of those agreements reached by February 29, and the hearing was held on March 1. Accordingly, any future negotiations would take place against the most coercive backdrop imaginable: Accept Argentina's terms without any guarantee that you will be paid before the Injunctions are lifted.

The very next day after the hearing, the district court entered the Order,[5] which "formally enter[ed] the Indicative Ruling as an order and vacate[d] the injunctions," SPA-82, subject to the same two conditions as the Indicative Ruling:

---

[5] The district court entered the Order both in Lead Plaintiffs' original cases and in the "me too" cases.

24

- "The Republic repeals all legislative obstacles to settlement with the FAA bondholders, including the Lock Law and the Sovereign Payment Law;

- "For all plaintiffs that entered into agreements in principle with the Republic on or before February 29, 2016, the Republic must make full payment in accordance with the specific terms of each such agreement. The Republic must also notify the court once those plaintiffs have all received full payment."

Order, SPA-84. To explain its haste, the district court stated, without elaboration, that "[t]he Argentine Congress must know where it stands." *Id.* at SPA-82. It added that Argentina "needs time to raise the capital required." *Id.* at SPA-82-83. But the district court made no finding that a capital raise was required. (As Lead Plaintiffs had explained, without contradiction, Argentina has more than sufficient cash on hand to fund the settlements. See *supra* at 14.) Nor did the district court make any finding that such a capital raise could not occur unless the Indicative Ruling were entered. (As Lead Plaintiffs had explained, again without contradiction, Argentina had just weeks earlier secured $5 billion in outside financing. See *supra* at 12, 14.) Finally, the district court noted the percentage of claims that had now been resolved (subject to the terms of the parties' agreements) and Argentina's "completely changed attitude." Order, SPA-83.

The district court did not include the clarification that Lead Plaintiffs had requested. Nor did the district court even acknowledge that the request had been made.

25

Aurelius and Blue Angel timely filed notices of appeal on March 3 from the Order and the underlying Indicative Ruling.

## SUMMARY OF ARGUMENT

I.     Argentina has not come close to demonstrating that circumstances have changed so as to warrant vacatur of Lead Plaintiffs' Injunctions.  And this is an important error to correct, because, if Argentina does not pay in full under the AIP, Lead Plaintiffs may find themselves challenging further efforts to attack the Injunctions.

A.     Courts may vacate permanent injunctions at a defendant's request only upon a showing of extraordinary circumstances.  In particular, the defendant must show that there has been a significant change in facts and that the purpose of the Injunctions has been achieved.

B.     Those circumstances are absent here.  The Injunctions' manifest purpose is to compel Argentina to specifically perform its obligations under the Pari Passu Clause.  But Argentina has not done so, and vacating the Injunctions would serve only to permit Argentina to process its illegal payments on the Exchange Bonds.

C.     The dubious purpose that the district court appears to ascribe to the Injunctions—to effect settlement—is unsupported by the record.  In any event, that

purpose has not been achieved here, where Argentina has bought off some plaintiffs by paying their claims in full and refused to negotiate with others.

II.    Should the Court affirm the Order, it should make an important clarification.  The Order permits the Injunctions to be vacated only if Argentina "make[s] full payment in accordance with the specific terms of" agreements it reached with plaintiffs by February 29.  The possibility of termination therefore gives Argentina a bargained-for (and much-needed) incentive to make timely payment.  If Argentina's behavior causes Lead Plaintiffs to terminate their Agreement in Principle—as would be their right, due to Argentina's failure to pay by April 14, under the negotiated terms of the AIP—Argentina could not satisfy the Order's condition.  That is, by its "specific terms," the AIP would no longer entitle Argentina to settle Lead Plaintiffs' claims for the prescribed amounts, and so Argentina could no longer make payment "in accordance with" those terms.  The Court should clarify that the Order operates as the AIP contemplates and reject Argentina's strained argument to the contrary.

Without that construction, the Order's legal basis is even more unsound.  In that event, Argentina would succeed in having the Injunctions lifted upon payment to only a tiny fraction of creditors—9.6% would be paid in full, and another 9.5% would receive settlement payments.  The purported basis of the Order was that Argentina would pay the vast majority of creditors before the Injunctions could be

27

lifted. Under Argentina's reading, the Order would permit Argentina to fail to pay 65% of the relevant claims as required by the AIP (*and* fail to pay the remaining 15% of claims that were not under agreement by February 29) and yet still lift the Injunctions. At a minimum, the Order must require Argentina actually to deliver on the promises it made in its February agreements.

## STANDARD OF REVIEW

"A district court's modification of an injunctive decree will not be disturbed on appeal, absent a showing that the court abused its discretion. The test of that discretion is measured by whether the requested modification effectuates or thwarts the purpose behind the injunction." *Sierra Club v. U.S. Army Corps of Eng'rs*, 732 F.2d 253, 257 (2d Cir. 1984) (citing *Chrysler Corp. v. United States*, 316 U.S. 556, 562 (1942)). The same standards govern vacatur of injunctions. See *Horne v. Flores*, 557 U.S. 433, 447 (2009).

## ARGUMENT

## I. The Standard For Vacating The Injunctions Is Not Satisfied Here

Vacatur of permanent injunctions is extraordinary relief. To secure it, a defendant must make an extraordinary showing. It must show that circumstances have changed so much that continued enforcement of the injunctions is no longer equitable and that the injunctions' purpose has been achieved.

28

Argentina has utterly failed to make that showing here. The manifest purpose of the Injunctions is to compel Argentina to honor the Pari Passu Clause. But Argentina seeks to vacate the Injunctions precisely so that it may *resume breaching* that Clause. Even were the district court correct to disregard that purpose and hold instead that the purpose is to effect settlements, the facts still do not come close to meeting the standard. For these reasons, the Court should vacate the district court's Order.

### A. The District Court Lacked Discretion To Vacate The Injunctions Unless There Was A Significant Change In Circumstances And The Injunctions' Purpose Had Been Achieved

District courts' discretion to vacate permanent injunctions is narrowly circumscribed. Vacatur is permissible only when, due to an extraordinary change of circumstances, anything short of vacatur would be inequitable. And it is impermissible when the injunctions have yet to achieve their purposes.

Because a permanent injunction is a "final judgment [or] order," the district court may vacate it only for the reasons specified in Civil Rule 60(b). Of those reasons, the one that Argentina claims is applicable here is that "applying [the Injunctions] prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5).[6] Relief under this rule is "extraordinary judicial relief" that is available only if the movant

---

[6]  Relief under the catch-all provision, Rule 60(b)(6), is available "only if the other, more specific grounds for relief encompassed by the rule are inapplicable." *Maduakolam v. Columbia Univ.*, 866 F.2d 53, 55 (2d Cir. 1989).

29

"demonstrates exceptional circumstances." *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 126 (2d Cir. 2009) (quoting *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008)). Because equity is necessarily fact-laden, the evaluation of the changed nature of the equities should be performed on a plaintiff-by-plaintiff basis. See *Rogers v. 66-36 Yellowstone Blvd. Coop. Owners, Inc.*, 599 F. Supp. 79, 82 (E.D.N.Y. 1984).

Among the circumstances necessary to vacate injunctions under Rule 60(b)(5) is a significant change of facts, and the "party seeking modification . . . bears the burden" of making that showing. *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383-84 (1992); see *Sierra Club*, 732 F.2d at 256 ("[A] court may modify a final or permanent injunction only where [there is] a significant change in the law or facts."). Changes of facts are sufficiently important only if they have caused "dangers, once substantial, [to] have become attenuated to a shadow." *United States v. Swift & Co.*, 286 U.S. 106, 119 (1932). "Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation." *Ibid.* Even if the changed circumstances clear this threshold, district courts may not do whatever they wish to injunctions. Rather, any modification or vacatur must be "suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 383.

30

Here, such a showing would require that the Injunctions have achieved their purpose. "A final or permanent injunction . . . may not be changed in the interest of the defendants if the purposes of the litigation as incorporated in the decree have not been fully achieved." *Sierra Club*, 732 F.2d at 256 (citing *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 248 (1968)). Even if "not every provision of the decree ha[s] been satisfied," it is important that "the decree ha[s] served its primary purpose." *United States v. Eastman Kodak Co.*, 63 F.3d 95, 101 (2d Cir. 1995). A "finding that the purposes of [an injunction] ha[ve] been fully achieved" entails a finding "that it [is] unlikely that the [defendant] would return to its former ways." *Bd. of Educ. of Oklahoma City Pub. Sch. v. Dowell*, 498 U.S. 237, 247 (1991).

### B. The Change In Circumstances Here Frustrates Rather Than Effectuates The Injunctions' Purpose Of Ensuring That Argentina Performs Its Obligations Under The Pari Passu Clause

The purpose of the Injunctions is plain from the Injunctions themselves and from this Court's opinions affirming them—to "order[] Argentina to specifically perform its obligations under" the Pari Passu Clause. *NML I*, 699 F.3d at 254. Argentina has not done that. To the contrary, even today, Argentina stands in unpurged contempt of the Injunctions, and the only reason no payments have reached the Exchange Bondholders is that third parties have intercepted them. There is every indication that, if the Injunctions disappear, Argentina would go on

31

breaching the Pari Passu Clause. Indeed, the explicit goal of the Order is to lift the Injunctions—the obvious purpose of which is to allow Argentina to resume paying on the Exchange Bonds without paying holders of FAA Bonds. All of this warrants keeping the Injunctions in place, not vacating them.

When the district court entered the Injunctions, it left no doubt about their purpose. Specific performance of the Pari Passu Clause is written all over the district court's holding in granting that relief. Plaintiffs suffered irreparable harm because Argentina's "payment obligations" to them were "debased of their contractually-guaranteed status" in the absence of equitable relief. A-534. There was no adequate remedy at law because Argentina "made clear . . . its intention to defy any money judgment." *Ibid.* The balance of the equities favored Lead Plaintiffs because of Argentina's "repeated failures to make required payments" to them. *Ibid.* And, finally, the public interest favored the Injunctions because "there is a strong public interest in holding the Republic to its contractual obligations." A-535. "[A]ccordingly," the district court ordered Argentina "to specifically perform its obligations" under the Pari Passu Clause. *Ibid.*

This Court reinforced the point of the Injunctions both times it affirmed them. The Injunctions, it held, were "designed to remedy Argentina's failure to pay bondholders after a default in 2001 on its sovereign debt." *NML I*, 699 F.3d at 250. They "direct Argentina to comply with its contractual obligations not to alter

32

the rank of its payment obligations." *Id.* at 262. The second time around, this Court's view was no different: "[T]he district court's decision does no more than hold Argentina to its contractual obligation of equal treatment." *NML II*, 727 F.3d at 241.

Indeed, Argentina itself has repeatedly lamented that the purpose of the Injunctions is to secure the payment that is due to Lead Plaintiffs under the FAA. *E.g.*, Petition for Certiorari, *Republic of Argentina v. NML Capital Ltd.*, No. 13-990, 2014 WL 662133, at *i (Feb. 18, 2014) ("The Second Circuit below nonetheless affirmed injunctions that coerce Argentina into paying [Lead Plaintiffs]."); Petition for Certiorari, *Republic of Argentina v. NML Capital, Ltd.*, No. 12-1494, 2013 WL 3225959, at *26 (June 24, 2013) ("It is difficult to characterize the Injunctions as anything *but* a collection device."); Reply Brief, *NML Capital, Ltd. v. Republic of Argentina*, No. 12-105(L), 2013 WL 453951, at *6 (2d Cir. Feb. 1, 2013) ("[T]he Amended Injunctions are designed to further [Lead Plaintiffs'] collection efforts."). In short, the district court, this Court, and even Argentina have for years recognized that the purpose of the Injunctions is to require equal payment to FAA Bond holders as their contract terms require.

The district court's Order runs directly contrary to the purpose of the Injunctions. Injunctions typically have served their purpose if, once vacated, it is reasonably certain that the defendant will not "return to its former ways." See *Dowell*,

498 U.S. at 247; accord, *e.g.*, *SEC v. Warren*, 583 F.2d 115, 121 (3d Cir. 1978) (vacating injunction where "there is very little likelihood that [the violation] will occur again"). Not so here. The point of the Order is to *permit* Argentina to process payments on its Exchange Bonds without making payments on the FAA Bonds—that is, to violate the Pari Passu Clause. *E.g.*, Indicative Ruling, SPA-65 ("If the court vacates the injunctions, the Republic may once again pay the exchange bondholders."). The whole idea is to let Argentina go back to its "old ways," and the only basis for allowing such relief is that Argentina has promised that it will attempt to pay some number of settling bondholders and has made a take-it-or-leave-it offer to the rest.

Today, Lead Plaintiffs are settling parties who stand to be paid under their AIP before the Injunctions are lifted. But that may not be true tomorrow (or, more precisely, if Argentina does not pay by April 14 and Lead Plaintiffs choose to terminate the AIP). In that event, we will again find ourselves defending the Injunctions against Argentina's attacks. Accordingly, refuting Argentina's flawed premises when seeking to lift the Injunctions remains important even though Lead Plaintiffs have a settlement agreement in place.

Indeed, the Injunctions were the only remedy adequate to enforce the FAA's terms; vacating them on these terms will effectively strip bondholders of their contractual rights based solely on their refusal to accept terms dictated under

34

coercive conditions.  As this Court held, "it is clear . . . that monetary damages are an ineffective remedy for the harm plaintiffs have suffered as a result of Argentina's breach."  *NML I*, 699 F.3d at 262.  Holders of FAA Bonds are "completely within their rights" to hold Argentina to the FAA's terms instead of accepting Argentina's unilateral cents-on-the-dollar offers under the specter of imminent drop-dead dates.  *Id.* at 263 n.15.  Vacating the Injunctions all but ensures that some non-trivial number of holders of outstanding FAA Bonds will have no remedy and thus, in effect, no rights.

## C.   Revisionist History In Which The Injunctions' Purpose Is To Effect Settlement Cannot Justify The District Court's Order

The district court did not get even the first step of this analysis right.  It did not hold, as this Court has instructed, that an injunction "may not be changed in the interest of the defendants if the purposes [of the injunction] have not been fully achieved."  *Sierra Club*, 732 F.2d at 256.  Instead, it held merely that an injunction's purpose is something that "[a] court should also consider."  Indicative Ruling, SPA-57.[7]  Having paid that lip service, the court said nothing further about the

---

[7]    The district court went on to hold that, "where equitable, a court may vacate an injunction 'even though the purpose of the decree has not been achieved.'" Indicative Ruling, SPA-58 (quoting *Eastman Kodak*, 63 F.3d at 102).  In the very next sentence, which the district court neglected, this Court held:  "However, as a general matter, we believe that [a] defendant should not be relieved of [an injunction] until the purpose of the decree has been substantially effectuated, or when

Injunctions' purpose.  It is a bit difficult to tell, therefore, what the district court believed that purpose to be.

Reading the district court's rulings, one might think that the purpose of the Injunctions was to effect a change in Argentina's attitude.  *E.g.*, *id.* at SPA-53 ("President Macri's election marked a turning point in the Republic's attitude and actions."); *id.* at SPA-59 ("President Macri's election changed everything.  Most importantly, the Republic has shown a good-faith willingness to negotiate."); *id.* at SPA-62 ("Although the court takes no position on the reasonableness of the Republic's Proposal, the court does recognize the Republic's earnest efforts to negotiate and its striking change in attitude toward settlement since President Macri assumed office."); Order, SPA-83 (noting Argentina's "completely changed attitude").

The talk about Argentina's attitude thinly covers what the district court seemed to believe is the true objective—settlement.  See Indicative Ruling, SPA-51, -52, -53-55, -59-63, -65-66, -67-69; Order, SPA-82-84.  But nothing in the record of the Injunctions' genesis supports the idea that settlement was the goal all along.  Besides, it is questionable at best whether settlement is a valid objective.  Even the district court conceded that it lacked "the power to force plaintiffs to accept a settlement."  Indicative Ruling, SPA-68.  And that is putting it mildly.  See

time and experience demonstrate that the decree is not properly adapted to accomplishing its purposes." *Eastman Kodak*, 63 F.3d at 102.

36

*Goss Graphics Sys., Inc. v. DEV Indus., Inc.*, 267 F.3d 624, 627-28 (7th Cir. 2001) ("If parties want to duke it out, that's their privilege."); *Kothe v. Smith*, 771 F.2d 667, 669 (2d Cir. 1985) ("Although the law favors the voluntary settlement . . . , it does not sanction efforts by trial judges to effect settlements through coercion."). Moreover, the district court expressly eschewed any "position on the reasonableness" of Argentina's tender offer. Indicative Ruling, SPA-62. Thus, the district court apparently believed that the Injunctions' purpose was to facilitate *any* settlement, no matter how unfair or unreasonable it might be to some of the parties. That was not the purpose of the Injunctions.

Even if settlement is the Injunctions' purpose—and even if that is legal— that purpose is far from achieved. When the district court first entered its Indicative Ruling, a mere 4.8% of the pari passu claims were subject to a settlement agreement. As described above, the Montreux group agreed to accept 72.5% of its approximately $426 million in claims. The only other creditor with an agreement was EM, which had not settled at all—it had "agreed" to accept 100% payment on its $849 million in claims. The district court thus made clear its willingness to enter the Order even if just a tiny fraction of plaintiffs had reached settlement agreements. Only because this Court delayed entry of the ruling by remanding on the condition that the district court hold a hearing—which condition the district

37

court only nominally observed—could the district court claim that a majority of creditors had reached agreements before the Order was ultimately entered.

Even then, the Order was entered with complete indifference as to whether non-settling parties were given even the opportunity to negotiate. As those appellants no doubt will explain at greater length, a significant swath of plaintiffs were denied the opportunity to negotiate with Argentina, whether directly or via the Special Master. They received merely an edict to accept by February 29 the haircut imposed by the public offer. If the purpose of the Injunctions was to foster settlements, it is difficult to see how that was achieved by an order giving Argentina's unilateral tender offer the force of law.

Finally, the Order might run roughshod over the district court's purported goal of achieving and respecting settlements. As explained below, Lead Plaintiffs settled with Argentina on terms that permit them to terminate their AIP and retain all their rights under the Injunctions if payment is not made by April 14. But Argentina urges a construction of the Order that would contradict the terms on which Lead Plaintiffs settled—it would permit vacatur of the Injunctions if the AIP is terminated. Argentina's construction therefore would enable the Injunctions to be vacated upon Argentina's payment of just 19.2% of the claims in this litigation. Even if the objective is global settlement, the Order may well prolong this dispute for the vast majority of creditors.

\*　　\*　　\*

In sum, the sequence of events leading to entry of the Order was designed to terminate the Injunctions based solely on Argentina's willingness to make a (conditional) offer that was higher than the edicts it had issued in 2005 and 2010. The timing was orchestrated to impose maximum coercion on creditors—providing mere days to respond to an *ex parte* order to show cause threatening to tear apart Injunctions years in the making; entry of a 23-page Indicative Ruling mere hours after briefing was completed; eleventh-hour maneuvering to avoid supervision by this Court; mere lip service to this Court's requirement to hold a hearing in the district court; immediate entry of the Order; all followed by breathless urgency to have this Court resolve any appeals before Argentina commits itself to parting with a nickel. Thus, while the district court asserted that "everything" has "changed," SPA-59, thus far it is business as usual: *Argentina is willing to obey the orders of the United States courts only on such terms as it may find agreeable.* Recent events thus serve only to confirm the continued need for the Injunctions to remain in force.

## II. If The Court Affirms The Order, It Should Hold That The Order Means What It Says When It Requires Payment "In Accordance With The Specific Terms Of" Agreements Reached By February 29

If the Court affirms the Order, it should do so only on the explicit understanding that the Injunctions cannot be lifted if (i) Argentina fails to pay Lead

Plaintiffs by April 14, and (ii) Lead Plaintiffs thereafter exercise their bargained-for right to terminate their Agreement in Principle. This right to terminate acts as insurance against mischief by Argentina—for example, seeking to pay some creditors while refusing to pay Lead Plaintiffs, or attempting to renegotiate the terms of their AIP. The termination provision also gives Argentina an important incentive to pay by the agreed-upon date—termination would render it impossible to satisfy the Order's conditions and, thus, to have the Injunctions vacated. Argentina, however, rejects that construction of the Order. It claims that it may wait as long as it wants to pay, regardless of the April 14 deadline; termination, it insists, would leave Argentina free to pay only the other 19.2% of claims that are covered by agreements reached in February, and then the Injunctions will be vacated across the board.

To avert further confusion and litigation—and to encourage Argentina to make good on its promises—the Court should affirm the Order only with the following clarification (or similar language): "For the avoidance of doubt, if Plaintiffs do not receive full payment in accordance with the specific terms of the AIP for any reason, including if Plaintiffs terminate the AIP on or after April 14, 2016 at 12:00 noon EST in accordance with the terms of the AIP, the Injunctions shall remain in place."

40

1.     As recent events illustrate, any settlement with Argentina comes with significant risk.  Argentina could, as it has many times, simply break its promises.  Moreover, at present, anything to which Argentina's administration agrees is subject approval by its Congress.  As matters stand today, Argentina's Congress must repeal the Lock Law and the Sovereign Payment Law, which were designed to prevent Argentina from resolving this litigation.  See *supra* at 7, 10-11.  So Congress could pocket-veto the settlements.  Or it could demand that the administration settle for less.  Or it could frustrate the settlements in some other way.  The point is, Congress is a wild card—and President Macri's party does not control it.

To mitigate this risk (and for other reasons), the Lead Plaintiffs' AIP included a termination provision.  In concept, the termination provision is no different from the springing deadlines that Argentina included in its tender offer and the Order it requested (and obtained) from the district court—except that the termination provision was actually *consensual*.  If a creditor accepted the tender offer by February 19, it got a better price; if a creditor cut a deal by February 29, it got the protections in the district court's Order.  So too here, if Argentina pays Lead Plaintiffs by April 14, Argentina can satisfy the payment condition in the district court's Order, but if Argentina does not make payment by that date, Lead Plaintiffs "have the right to terminate" the AIP.  AIP ¶ 10, A-2371.  To be sure, we hope that Argentina will pay in full under the terms of the AIP.  But the parties bargained for the

41

termination right in order to prevent Argentina and its Congress from exercising a pocket veto over Lead Plaintiffs' settlement while also attempting to strip away the Injunctions.  And it bears repeating that this termination right is implicated only if Lead Plaintiffs were to decide to terminate the AIP *after* Argentina has failed to pay by April 14.  That is, termination would be the consequence of Argentina's failure to do what it promised to do.  Argentina may avoid all of this by paying by the date to which it agreed in the AIP.

The termination provision gives Argentina and its Congress an incentive to close the deal by April 14.  The Order is, by its terms, crystal clear.  It vacates the Injunctions only if Argentina "make[s] full payment in accordance with the specific terms" of each agreement it reached by February 29.  Order, SPA-84.  Lead Plaintiffs' AIP is, indisputably, an agreement that Argentina reached by February 29.[8]  But, if Lead Plaintiffs exercise their termination right, then Argentina could no longer satisfy the Order's conditions.  By its "specific terms," the AIP would not entitle Argentina to settle the Lead Plaintiffs' claims for the prescribed amounts, and so Argentina could no longer make payment "in accordance with" those terms.  Thus, if the AIP is terminated, the Order could not take effect, and the

---

[8]   Just in case, the AIP says so expressly:  "The parties agree that this Agreement in Principle qualifies as an agreement in principle with the Republic of Argentina entered into on or before February 29, 2016 as contemplated by the Court's indicative order dated February 19, 2016."  AIP ¶ 10, A-2371.

Injunctions could not be vacated as to those parties who have yet to settle or who have settled but have not been paid in full under their agreements.

To confirm that the documents would operate as intended, Lead Plaintiffs requested that the district court not enter the Order without the ministerial clarification mentioned above.  See A-1860.  But the district court declined without giving a reason—indeed, the district court's Order (issued the very next day after the hearing at which counsel again sought this clarification, see A-2274-2278) made no mention of this request either way.  The district court simply ignored or overlooked it.

2.    To Lead Plaintiffs' surprise, Argentina fought that proposal.  In Argentina's view, the Order operates in a drastically different way:  Termination would render Lead Plaintiffs "no longer a settling party, so the order and the relief and the conditions contemplated in the indicative ruling no longer include them in the group of people who are entitled to payment prior to the relief from the injunctions."  A-2300-2301.  In other words, by exercising their termination right, Lead Plaintiffs would render the AIP void *ab initio*.

The practical difference between the parties' positions is stark.  In Lead Plaintiffs' view, termination means that the Injunctions cannot be vacated unless Lead Plaintiffs are paid what they were promised.  In Argentina's view, by contrast, termination would permit the Injunctions to be vacated upon payment to creditors

43

*other than* Lead Plaintiffs. In other words, Argentina could get the Injunctions vacated by paying just 19.2% of the claims. And what would Lead Plaintiffs get? The right to again "pursue their contract remedies" without the Injunctions—a concededly "unsuccessful avenue." A-2301.

Argentina's interpretation of the Order is untenable for at least three reasons.

<u>First</u>, Argentina's position defies common sense. There is no reason why Lead Plaintiffs would bargain for, much less invoke, a right whose exercise benefits Argentina at their expense. What they bargained for was a strong incentive for Argentina to make payment by April 14. Without that incentive, Lead Plaintiffs never would have agreed to the deal. Indeed, Lead Plaintiffs agreed to haircuts totaling $1.24 billion off their claims, in large part in exchange for the promise of prompt payment. They would have bargained for a different settlement amount (and perhaps other conditions) had they not been given the assurance of the termination provision (as properly understood in light of the Order's plain meaning). Argentina's reading of the Order is thus tantamount to amending the AIP by fiat.

<u>Second</u>, Argentina has waived its ability to make its argument. In the AIP, Argentina agreed that it would "not request the Court to vacate or modify the Injunctions . . . other than automatically upon *payment in full* to the Plaintiffs" under the AIP's terms. AIP ¶ 5, A-2367-68 (emphasis added). Yet, here, Argentina contends that the district court may vacate the Injunctions even though it has not

44

paid *anything at all* to Lead Plaintiffs (who hold 65% of the relevant claims). Because Argentina has contractually forgone this argument, the Court should not entertain it. See *In re Benedict*, 90 F.3d 50, 55 (2d Cir. 1996) (upon "an intentional relinquishment of a known right," a party may "waiv[e] [its] right to object"). Waiver aside, the provision just cited is compelling evidence that the AIP's termination would prevent satisfaction of the Order's conditions: Paragraph 5 forbids Argentina from seeking to lift the Injunctions except upon full payment to Lead Plaintiffs. It would make no sense to construe the Order—which requires satisfaction of all February agreements—to allow Argentina obtain vacatur if it chooses *not* to pay by the termination date.

Third, the Order simply does not say what Argentina claims it says. In Argentina's view, exercise of the "right to terminate this Agreement in Principle," AIP ¶ 10, A-2371, would render the AIP void *ab initio*. Thus, Argentina claims, the AIP would cease to be an "agreement[] in principle with the Republic," as the Order requires. Order, SPA-84. But that is not what "terminate" means. To terminate something means to bring it to an end, not to annul everything that had come before. *Benjamin v. Jacobson*, 172 F.3d 144, 159 (2d Cir. 1999) ("'[T]erminate' means 'to put an end to' or 'to end.'" (quoting *Inmates of Suffolk Cnty. Jail v. Rouse*, 129 F.3d 649, 662 (1st Cir. 1997))). Thus, "[t]he alleged termination of the contract, if the contract is valid, cannot affect the rights accrued prior to termina-

45

tion." *W. Elec. Co. v. Solitron Devices, Inc.*, 306 N.Y.S.2d 624, 625 (N.Y. App. Div. 1970) (per curiam).[9] And, so, the AIP would remain an "agreement[] in principle with the Republic [entered into] on or before February 29, 2016," pursuant to which payment must be made in order for the Injunctions to be vacated. See Order, SPA-84.

Argentina's interpretation of the Order appears to require misreading one sentence in the AIP. That sentence reads: "In the event that this Agreement in Principle is terminated . . . , the terminating Plaintiffs and the Republic of Argentina . . . shall thereupon be restored to their respective prior positions as if there had been no Agreement in Principle." AIP ¶ 10, A-2371. But that sentence only raises a question: What is the prior position of the parties? The answer is, the same position they have held for years—with the Injunctions in place and without plaintiffs having received payment. Under Argentina's construction, termination would put the parties in a *new* position, in which Argentina is not bound by the Injunctions.

Argentina not only misreads that sentence but also yanks it out of context. See *Kass v. Kass*, 696 N.E.2d 174, 180-81 (N.Y. 1998) ("Particular words should be considered, not as if isolated from the context, but in the light of the obligation

---

[9] The AIP is governed by New York law. AIP ¶ 9, A-2370.

as a whole and the intention of the parties as manifested thereby." (quotation marks omitted)).  The AIP goes out of its way to establish that it is an agreement "entered into on or before February 29," AIP ¶ 10, A-2371, and, thus, payment must be made under the AIP to satisfy the Order's condition precedent.  Consistent with the Order, the AIP makes plain that the Injunctions are to be vacated only "upon the receipt of the final payment" by Lead Plaintiffs, and Argentina agreed in the AIP not to seek vacatur of the Injunctions without making that payment.  AIP ¶ 5, A-2367-2368.  The April 14 deadline that triggers the termination right (and an increase to the interest rate applicable under the AIP if there is no termination, see AIP ¶ 1, A-2366) confirms that the parties intended to provide the strongest possible incentive for Argentina to effect payment by that date.  All of these provisions harmonize with Lead Plaintiffs' argument and clash with Argentina's.

3.    In addition, there are three important practical reasons why it is important that this Court, if it is inclined to affirm, explain that the Order does not vitiate Lead Plaintiffs' termination rights.

First, the effect of the Order varies wildly depending on whether Argentina's construction is accepted.  In Argentina's view, the district court was free to vacate the Injunctions based on the fact that just 9.5% of creditors had settled with Argentina and another 9.6% had been paid in full.  Defending the wholesale lifting of the

Injunctions on the basis that 19.2% of claims will be paid—following fifteen years of open defiance—is a tall order indeed.

Second, the termination provision serves an important, bargained-for function in attempting to resolve this long-running dispute. Because the Lock Law and the Sovereign Payment Law remain on the books, *any* settlement agreement is subject to final approval by Congress. In the absence of a termination provision like the one in the AIP, Argentina might argue that it is entitled to an indefinite time to decide whether to approve the deal. As Argentina's negotiators presumably recognized in agreeing to the April 14 termination deadline, however, Congress needs to feel some pressure to vote yay or nay.

But in Argentina's view, the Order would completely vitiate that contractual right. That is, Lead Plaintiffs effectively cannot exercise their contractual right to terminate because the district court will take away their Injunctions. So the practical effect of Argentina's position is to amend the Order to condition lifting of the Injunctions on payment under the agreements "no matter how long it may take, even if the parties agreed to something different." If Argentina is serious about resolving these disputes, it must recognize that it is required to live up to conditions to which it has agreed.

Third, it is important for everyone else involved in this sprawling litigation to know the status of the Lead Plaintiffs' Injunctions in the event Lead Plaintiffs

48

decide to terminate the AIP. Recall that the Order promises that the Injunctions shall be lifted "automatically" upon satisfaction of the conditions precedent. There thus will be no formal order from the district court certifying that the conditions have or have not been met. To avoid yet another wave of urgent litigation, this Court should make crystal clear that, if Argentina does not pay Lead Plaintiffs under their AIP, their Injunctions remain in force.

## CONCLUSION

The Court should vacate the Order and the Indicative Ruling. In the alternative, it should affirm the Order and the Indicative Ruling subject to the following understanding: "For the avoidance of doubt, if Plaintiffs do not receive full payment in accordance with the specific terms of the AIP for any reason, including if Plaintiffs terminate the AIP on or after April 14, 2016 at 12:00 noon EST in accordance with the terms of the AIP, the Injunctions shall remain in place."

Dated: March 14, 2016              Respectfully submitted,

                                   /s/ Roy T. Englert, Jr.

Edward A. Friedman                 Roy T. Englert, Jr.
Daniel B. Rapport                  Mark T. Stancil
FRIEDMAN KAPLAN SEILER             Joshua S. Bolian
  &amp; ADELMAN LLP               ROBBINS, RUSSELL, ENGLERT, ORSECK,
7 Times Square                       UNTEREINER &amp; SAUBER LLP
New York, NY 10036                 1801 K Street N.W., Suite 411
(212) 833-1100                     Washington, DC 20006
                                   (202) 775-4500
                                   renglert@robbinsrussell.com

*Counsel for Appellants Aurelius and Blue Angel*

50

## CERTIFICATE OF COMPLIANCE

Counsel certifies as follows:

1.      This brief complies with the type-volume requirement of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 11,673 words, as determined by the word-count function of Microsoft Word 2010, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.


Dated: March 14, 2016                 /s/ Roy T. Englert, Jr.
                                      Roy T. Englert, Jr.
                                      *Counsel for Appellants*
                                      *Aurelius and Blue Angel*

## CERTIFICATE OF SERVICE

I hereby certify that, on March 14, 2016, I caused a true and correct copy of the foregoing Brief For Plaintiffs-Appellants Aurelius Capital Master, Ltd., ACP Master, Ltd., Aurelius Capital Partners, LP, Aurelius Opportunities Fund II, LLC, And Blue Angel Capital I LLC to be filed with the Court by CM/ECF. All parties that have appeared are Filing Users and are served electronically by the Notice of Docket Activity generated by CM/ECF.

Dated: March 14, 2016
/s/ Roy T. Englert, Jr.
Roy T. Englert, Jr.
*Counsel for Appellants*
*Aurelius and Blue Angel*